# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3233

_____

Varlee Kamara,                          *
                                        *
            Petitioner,                 *
                                        *
      v.                                *    Petition for Review of an
                                        *    Order of the Board of
Alberto R. Gonzales, Attorney           *    Immigration Appeals.
General of the United States            *
of America,                             *    [UNPUBLISHED]
                                        *
            Respondent.                 *

_____

Submitted: April 18, 2006
Filed: May 15, 2006

_____

Before WOLLMAN, BEAM, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Varlee Kollre Mamadee Kamara, a native and citizen of Liberia, entered the United States in January 2001 with a valid F-1 student visa. He never enrolled in school, but applied for asylum in May 2001. The then-Immigration and Naturalization Service began removal proceedings. Kamara conceded removability, but renewed the asylum application, alternatively seeking withholding of removal, protection under the Convention Against Torture, or voluntary departure. The Immigration Judge ("IJ") denied relief. Kamara appealed the denial of his asylum application to the Board of Immigration Appeals ("BIA"), which affirmed without

opinion. Kamara appeals. Having jurisdiction under 8 U.S.C. § 1252, this court affirms.

Kamara asserts he fears persecution in Liberia because he is a Mandingo whose family has historically supported anti-government forces. Kamara claims – but offered no corroboration – that between 1991 and 2000, his father helped found and lead three different rebel groups – the United Liberation Movement for Democracy in Liberia, the All Liberian Coalition Party, and Liberians United for Reconciliation and Democracy ("LURD") – all devoted to ousting the Charles Taylor government by force. Kamara joined each of these groups, working most recently as a recruiter for LURD in 1999 and 2000. He alleges that his association with these groups makes him a target for execution in Liberia.

At the hearing, Kamara focused on two events. First, he claimed he and his brother were detained, handcuffed, and beaten by Taylor security officers at a checkpoint in July 2000. On cross-examination, Kamara testified that the officers stabbed him with a bayonet, threatened to kill him, and left him handcuffed to his brother in an abandoned house while awaiting further orders from their commander. About 15 minutes later, Kamara and his brother escaped by vehicle to a village where a local woman treated their injuries. When Kamara returned to his own village, his father insisted he and his brother leave Liberia to study in the United States, because he believed they were unsafe at home.

Second, Kamara testified that Taylor's security forces fatally shot his father on the family coffee farm in February 2001 – after Kamara arrived in the United States. Kamara stated he learned about the shooting in a letter from a friend, who reported that approximately 20 security forces arrived at the farm to arrest his father. When his father asked for an arrest warrant, the guards shot him, also killing Kamara's young cousin. Kamara asserted that Taylor's forces were also searching for him, as friends related through letters and telephone conversations that he would be executed if he

returned to Liberia. In support, Kamara presented letters, a document from the Liberian Justice Department corroborating his father's death, and a March 2003 Liberian newspaper article about his family's struggles with Taylor's security forces.

The IJ denied all claims for relief, because she disbelieved Kamara's testimony and evidence. The IJ held that, even if Kamara was credible, he did not meet his burden of proving past persecution or a well-founded fear of future persecution. Specifically, the IJ found that country conditions have dramatically changed in Liberia since Kamara left, because Taylor resigned from power and fled in exile to Nigeria in 2003. As Kamara prominently based his fears of persecution on the reign of the Taylor government, the IJ determined that his concerns were no longer reasonable.

Kamara appealed the denial of asylum to the BIA, which summarily affirmed. When the BIA affirms without opinion, this court reviews the decision of the IJ as the final agency action. *See Melecio-Saquil v. Ashcroft*, 337 F.3d 983, 986 (8th Cir. 2003). This court examines the IJ's factual findings for substantial evidence, and will reverse only if the petitioner's evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Ruzi v. Gonzales*, 441 F.3d 611, 614 (8th Cir. 2006). Moreover, this court defers to the IJ's credibility determinations where "supported by a specific, cogent reason for disbelief." *Hassanein v. Ashcroft*, 380 F.3d 324, 327 (8th Cir. 2004), *quoting Perinpanathan v. Ashcroft*, 310 F.3d 594, 597 (8th Cir. 2002).

The Attorney General has discretion to grant asylum to any refugee who is unwilling or unable to return home because of "(1) past persecution or (2) a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." **8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)**. To establish a well-founded fear of persecution, the petitioner need not prove with mathematical certainty that he or she will face persecution if returned

home. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987). Still, the petitioner's fear must be both subjectively and objectively reasonable, such that a reasonable person in the petitioner's position would fear persecution on account of a statutorily-protected ground if forced to depart. *See Regalado-Garcia v. INS*, 305 F.3d 784, 788 (8th Cir. 2002).

Kamara argues he suffered past persecution by Taylor's military forces, evidenced by the July 2000 detention and beating at the security checkpoint. While Kamara testified about this incident, he did not include it in his asylum application in response to any question about past persecution. It also appears that he told the asylum officer that he was only detained, not stabbed, beaten, or threatened with death; the officer's interview notes discuss only a 15-minute detention. The IJ found these omissions significant, forming the basis of the negative credibility finding. "An omission alone is normally insufficient for an adverse credibility finding, but if it goes to the 'heart of the asylum claim,' it does raise a credibility issue." *Cao v. Gonzales*, 442 F.3d 657, 661 (8th Cir. 2006), *quoting Kondakova v. Ashcroft*, 383 F.3d 792, 796 (8th Cir. 2004). *See also Prokopenko v. Ashcroft*, 372 F.3d 941, 945 (8th Cir. 2004). Because the 2000 detention and (alleged) beating are central to Kamara's asylum claim, this court agrees that the omissions are significant and defeat his claims of past persecution.

Because Kamara did not prove past persecution, he does not receive the benefit of a rebuttable presumption of future persecution if returned to Liberia. *See Eta-Ndu*, 411 F.3d at 983; **8 C.F.R. § 1208.13(b)(1)(i)**. He must establish by other direct, credible evidence that he personally has a well-founded fear of persecution, which is objectively reasonable. *See Berte v. Ashcroft*, 396 F.3d 993, 996 (8th Cir. 2005); *Shoaria v. Ashcroft*, 377 F.3d 837, 844 (8th Cir. 2004). To meet this burden, Kamara testified and presented letters about his father's February 2001 death, correspondence from the Liberian Justice Department, and a March 2003 newspaper article about the family's struggles with Taylor's security forces. Again, the IJ determined that this

testimony and evidence lacked credibility. Importantly, the article (from *The Independent*, a Liberian newspaper) did not report that Kamara's father was killed. Rather, it stated that Taylor's security forces took him from the family coffee farm and that the family did not know his current location. The article also reported that Kamara and his brother fled Liberia after his father's disappearance in February 2001. In fact, Kamara entered the United States before this incident, in January. The IJ found that the newspaper article was fabricated, as the date appeared cut-and-pasted onto the document. When a document is fabricated, "it goes to the entirety of the [petitioner's] credibility on all of his claims for relief." ***Bropleh v. Gonzales***, 428 F.3d 772, 776 (8th Cir. 2005).

The IJ also expressed suspicion about the letters Kamara presented from family friends in Liberia. The letters had no envelopes, return addresses, or phone numbers, and Kamara did not call either of two readily-available witnesses to testify to their authenticity. Kamara did not have his brother or a local family friend corroborate any of his testimony before the IJ. He admitted both were available, but stated he did not know why they were needed at the hearing. As Kamara could not produce a death certificate, or any other reliable, corroborating evidence of his father's death, the IJ determined that his fears of future persecution were not credible. The IJ's credibility findings are "'conclusive unless any reasonable adjudicator would be compelled to conclude the contrary.'" ***Turay v. Ashcroft***, 405 F.3d 663, 668-69 (8th Cir. 2005), *quoting **Pilica v. Ashcroft***, 388 F.3d 941, 952 (6th Cir. 2004).

Finally, the IJ held that, even if Kamara's fears were subjectively credible, country conditions in Liberia have changed so that his fears are no longer objectively reasonable. The IJ noted that, because Taylor resigned the presidency in August 2003 and fled to Nigeria, the more stable government in Liberia does not pose the same threats as the Taylor regime. While Kamara reasserts that Taylor may still exert influence from Nigeria, the IJ determined that his fears were no more than fears of the general civil strife that affects all Liberians. This is not a basis for granting asylum.

*See **Krasnopivtsev v. Ashcroft***, 382 F.3d 832, 839-40 (8th Cir. 2004), *citing **Lopez-Zeron v. U.S. Dep't of Justice, INS***, 8 F.3d 636, 638 (8th Cir. 1993).

The decision of the BIA is affirmed.

_____